CBS INC.; Fox Broadcasting Co.; CBS Television Affiliates Association; Post–Newsweek Stations Florida, Inc.; KPAX Communications, Inc.; LWWI Broadcasting, Inc.; and Retlaw Enterprises, Inc., Plaintiffs,

v.

PRIMETIME 24 JOINT VENTURE, Defendant.

No. 96–3650–CIV.

United States District Court, S.D. Florida.

May 13, 1998.

David Michael Rogero, Akerman Senterfitt & Eidson, Miami, FL, Lawrence A. Kasten, Thomas P. Olson, Wilmer, Cutler & Picker-ing, Washington, DC, Jonathan C. Drimmer, Covington and Burling, Washington, DC, for CBS, Inc. & Fox Broadcasting Inc.

Neil K. Roman, Michael X. Imbroscio, Jonathan R. Galst, Covington and Burling, Washington, DC, for CBS Television Affiliates Association, Post–Week Stations, KPAX Communications, Inc., LWWI Broadcasting, Inc., Retlaw Enterprises, Inc.

Brian F. Spector, Kenny Nachwalter Seymour Arnold Critchlow, Miami, FL, Andrew Z. Schwartz, Foley Hoag & Eliot, Boston, MA, for PrimeTime 24 Joint Venture's.

## ORDER AFFIRMING IN PART AND REVERSING IN PART MAGISTRATE JUDGE JOHNSON'S REPORT AND RECOMMENDATION

NESBITT, District Judge.

This cause comes before the Court upon Magistrate Judge Linnea R. Johnson's Report and Recommendation ("Report" or "R & R"), entered July 2, 1997 (D.E.# 148), regarding Plaintiffs'[1] Motion for Preliminary Injunction, filed March 11, 1997 (D.E.# 45). PrimeTime 24 Joint Venture's ("PrimeTime 24") objections to the Report and Recommendation were timely filed on August 1, 1997 (D.E.# 156). Therefore, pursuant to 28 U.S.C. § 636 the Court must review the Report *de novo*.

After due consideration of the Report, PrimeTime 24's Objections, Plaintiffs' Response, and the entire record, the Court **AFFIRMS in part** and **REVERSES in part** the Report for the following reasons.

### INTRODUCTION

This is a copyright infringement action. Plaintiffs own exclusive rights in copyrighted network television programs that are retransmitted by PrimeTime 24 via satellite to its subscribers nationwide. The principal issue is whether PrimeTime 24's actions are permitted by the Satellite Home Viewers Act ("SHVA"), 17 U.S.C. § 119, which provides a limited statutory license to satellite carriers.[2]

---

1. CBS Inc., Fox Broadcasting Co., CBS Television Affiliates Association, Post–Newsweek Stations Florida, Inc., KPAX Communications, Inc., LWWI Broadcasting, Inc., and RETLAW Enterprises, Inc. (collectively "Plaintiffs")

2. In addition, PrimeTime 24 has a contractual license from FoxNet, Inc., a subsidiary of Plaintiff Fox Broadcasting Company. The contractual license reiterates the standard provided in 17 U.S.C. § 119.

The license in the SHVA permits PrimeTime 24 to transmit network programming only to "unserved households".

An "unserved household" is defined in 17 U.S.C. § 119(d)(10) as

"a household that—

(a) cannot receive, through the use of a conventional outdoor rooftop receiving antenna, *an over-the-air signal of grade B intensity (as defined by the Federal Communications Commission)* of a primary network station affiliated with that network, and

(B) has not, within 90 days before the date on which that household subscribes, either initially or on renewal, to receive secondary transmissions by a satellite carrier of a network station affiliated with that network, subscribed to a cable system that provides the signal of a primary network station affiliated with that network."

17 U.S.C. § 119(d)(10) (emphasis added). The principal dispute between the parties is over the meaning of the phrase "over-the-air signal of grade B intensity (as defined by the [FCC])" in Section 119(d)(10)(A). Plaintiffs contend that this means a signal of the intensity defined by the FCC as "grade B," [3] and that it is an objective standard. PrimeTime 24 contends that the statute permits it to rely on subjective statements by subscribers about "acceptable" picture quality in determining whether to provide network programming to its subscribers.

### BACKGROUND[4]

#### A. The Plaintiffs

Plaintiffs CBS, Inc. ("CBS"), and Fox Broadcasting Co. ("Fox") are two separate national television broadcast networks. The remaining Plaintiffs consist of several individual CBS network stations and a trade association of CBS affiliate stations. CBS and Fox own exclusive rights in copyrighted network television programs such as "60 Minutes" and "The Simpsons". They broadcast their network programs nationwide through a network of local television stations that, in turn, transmits the network's programming to viewers in their local markets. These local television stations—affiliates—are licensed to broadcast network programs to their local markets.

The partnership between national broadcast networks and their affiliates enables local network stations to offer the viewing public a mix of 1) national programming provided centrally by the networks, 2) local programming, such as news, weather, and public affairs, produced in-house by many local stations, and 3) syndicated programming acquired by local stations from third parties. For example, the local CBS affiliate provides its viewers with CBS's nationwide network programming, local news and weather, as well as programs from third parties (syndicated programming). This programming is available to the public for free, as long as they can receive the local broadcast signal.

As well as relying upon each other to provide programming to households nationwide, networks and affiliates rely upon each other financially. Both network stations and local affiliates derive a majority of their revenue from advertising (commercials). The price of such advertising is dependent on the type and size of a program's audience. The advertising dollars are split such that the network receives the advertising dollars during network commercials, and the local affiliate receives the advertising dollars during local commercials. Although local stations sell time on their programming, a majority of a station's revenues are derived from advertising on network programs. *See* R & R at 6.

Networks and affiliates both promote the programming of the other so as to increase a program's audience. For example, during a network program, there are often advertisements for a local program that will air adjacent to the network program. Given that advertising dollars increase when viewership

---

**3.** "Grade B intensity" is defined by the FCC in terms of signal strength: 47 dBu for television channels 2–6, 56 dBu for television channels 7–13, and 64 dBu for television channels 14–69. 47 C.F.R. § 73.683(a) (1996). "Grade A" refers to a stronger signal (i.e. with higher dBu levels), usually found closer to a transmission tower.

**4.** This section is drawn from Magistrate Judge Johnson's Report, and the transcript of the preliminary injunction hearing.

increases, maximizing viewership for both network and local stations is of great importance to maintaining the network/affiliate relationship.

## B. The Exception For Satellite Delivery to "Unserved Households"

CBS and Fox. are generally entitled to control how and when their programming is made available to the public. In 1988, however, Congress crafted the "compulsory license" exception for satellite carriers. This exception, codified in 17 U.S.C. § 119, allows satellite carriers to deliver network stations to satellite dish owners without the network's permission. The exception, however, is limited to "unserved households". *See* 17 U.S.C. § 119(1); *supra,* at 1335–36.

One of the reasons for the exception was to provide network service to households that could not receive broadcast signals over the air. *See* H.R.Rep. No. 100–887, part 1, at 14 (1988); *see, e.g.,* 134 Cong. Rec. H9660–01, 1988 WL 17005 (Cong.Rec.) (Oct. 5, 1988) ("The goal of the bill ... is to place rural households on a more or less equal footing with their urban counterparts.") (remarks of Rep. Kastenmeier).

## C. PrimeTime 24

It is not disputed that Defendant PrimeTime 24 is a "satellite carrier" as defined in 17 U.S.C. § 119(d). PrimeTime 24 transmits network programming (including CBS and Fox programming) to satellite dish owners ("subscribers") nationwide. PrimeTime 24 does not retransmit the signals of each local affiliate to its subscribers in that area, but rather offers the same network signals for sale to its subscribers.[5] Specifically, PrimeTime 24 has a contractual arrangement with a CBS affiliate and a Fox affiliate and broadcasts the programming from those affiliates to all of its subscribers. PrimeTime 24's broadcast substitutes the affiliates' local advertising with national advertising. *See* R & R at n. 6.

PrimeTime 24 sells its service through distributors, such as DirecTV, or directly to owners of certain satellite dishes. PrimeTime 24 offers two network programming

packages, PrimeTime East and PrimeTime West, as well as FoxNet, which offers Fox network programs. PrimeTime East is a package of ABC, CBS, and NBC programming from network stations located on the East Coast. PrimeTime West is a package of ABC, CBS, and NBC programming from network stations located on the West Coast. Subscribers can receive PrimeTime East, PrimeTime West and FoxNet together.

One of the advantages to PrimeTime 24's services is that viewers can watch network programs several hours later (or earlier) by watching a station from a distant time zone, and can see sports events (such as NFL football) that are not available locally.

PrimeTime 24 does not have a license from CBS to retransmit its programming. PrimeTime 24 has obtained a contractual license from Fox through an agreement with a Fox subsidiary, FoxNet, but that license extends only to "unserved households."

PrimeTime 24 attempts to comply with the SHVA by limiting its services to "unserved households." PrimeTime 24's contracts with its distributors require that the distributor sell satellite services only to eligible households under 17 U.S.C. § 119. To help determine whether a potential subscriber qualifies as an "unserved household," distributors are required to ask three questions: 1) whether they intend to use the programming for residential use; 2) whether they have subscribed to cable in the last 90 days; and 3) whether the household receives an acceptable picture over the air.

PrimeTime 24 will typically supply services to persons who state that: 1) they intend to use the programming for residential use, 2) have not subscribed to cable in the last 90 days, and 3) do not receive an acceptable picture over the air. PrimeTime 24 does not independently verify the strength of the network signals received by its subscribers. Neither does PrimeTime 24 check the location of potential subscribers to determine if they are likely to be able to receive a signal of grade B intensity.

---

**5.** PrimeTime 24's service differs from cable which is required to carry local stations. *See*

*Turner Broadcasting Sys. v. FCC,* 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997).

## D. The Dispute

Plaintiffs contend that PrimeTime 24's efforts to limit sales to "unserved households" are woefully insufficient. First, Plaintiffs argue that PrimeTime 24 has placed too much emphasis on individual subscribers' perception of the picture quality they receive over the air, and that such emphasis is questionable considering that many people seek PrimeTime 24's services for reasons unrelated to the fact that they cannot receive free network programming over the air.[6] Second, Plaintiffs argue that PrimeTime 24 will sell its services to any household without checking its location to confirm that it is unlikely to receive a signal of "grade B" intensity.[7] As a result, PrimeTime 24 provides its services to hundreds of thousands of individuals who do not fall within Congress' definition of an "unserved household."

According to Plaintiffs, PrimeTime 24's actions have upset the network/affiliate relationship because individuals who subscribe to PrimeTime 24's service do not watch local network programs provided by the affiliates. This is due to the fact that PrimeTime 24 does not transmit local affiliate programming or advertising. Instead, as mentioned previously, PrimeTime 24 transmits the network programs broadcast by the handful of affiliates with which it has a contractual agreement, and substitutes local advertising with national advertising. Accordingly, Plaintiffs contend that PrimeTime 24's violation of the SHVA is reducing the number of viewers for local affiliate programming and advertising, which in turn reduces an affiliate's revenue stream.

After four days of oral argument on Plaintiffs' Motion for Preliminary Injunction, the Magistrate Judge entered a Report granting the request for injunctive relief. The Report stated that Plaintiffs had met their burden of establishing that PrimeTime 24's efforts to comply with the SHVA were insufficient and constituted a willful or repeated violation of the act.

PrimeTime 24 has filed lengthy objections to the Report. Three main issues emerge from the objections: 1) whether picture quality should be considered when determining whether a household falls within the definition of "unserved households;" 2) whether Plaintiffs met their burden of demonstrating that PrimeTime 24 is providing service to ineligible households and that such violations were willful or repeated; and 3) whether PrimeTime 24 sufficiently rebutted Plaintiffs' evidence.

In addition to those primary issues, PrimeTime 24 contends that injunctive relief should not be granted because Plaintiffs have not suffered irreparable harm, the balance of harms do not favor an injunction, the public interest will not be served by an injunction, and the proposed injunction would not be manageable.

### DISCUSSION

In order to grant a preliminary injunction, a district court need not find that the evidence guarantees a verdict in favor of the plaintiff. Rather, it must determine that the evidence establishes: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1341–42 (11th Cir.1994)).

### A. Substantial Likelihood of Success

#### 1. "Unserved Households"

##### a. PrimeTime 24's Interpretation

PrimeTime 24 maintains that the Magistrate Judge erred in finding that Plaintiffs established a likelihood of success in proving

---

**6.** Such reasons include: 1) access to additional network stations, 2) ability to watch network programs several hours earlier or later by watching stations from a distant time zone, 3) access to sports programs that are unavailable locally, and 4) obtaining network programming without installing or maintaining an antenna. *See* R & R at 10.

**7.** As referred to in 17 U.S.C. § 119, *supra* at 1335–36.

that PrimeTime 24 violated the SHVA. The Magistrate's first error, according to Prime-Time 24, involved the definition of "unserved households." PrimeTime 24 argues that the intent of the SHVA is to provide clear reception of network signals to households that cannot now receive them ("unserved households"). Thus, whether a household receives a clear picture is of great significance to determining whether that household is "unserved" un the statute. *See* Obj. at 20. PrimeTime 24 contends that the Magistrate incorrectly ignored the importance of picture quality and therefore failed to consider that PrimeTime 24's policy of providing services to individuals who state that they cannot receive an acceptable picture over the air conforms with the SHVA.

### b. Statutory Interpretation

■ The SHVA defines an "unserved household" as "a household that (A) cannot receive, through the use of conventional outdoor rooftop receiving antenna, *an over-the-air signal of grade B intensity (as defined by the Federal Communications Commission)* of a primary network station affiliated with that network." 17 U.S.C. Section 119(d)(10) (emphasis added). Despite PrimeTime 24's contention that clear reception of network signals is of significance, the statute does not discuss clear reception. Rather, the plain language of the statute adopts the FCC's definition of a grade B signal (an objective test) to determine whether a household is an "unserved household."

■ A basic tenet of statutory construction is that a court should give the statutory language its ordinary and plain meaning. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *Unit-*

ed States v. Scrimgeour, 636 F.2d 1019, 1022 (5th Cir.1981). The Magistrate Judge correctly gave the statute its plain meaning and found that Congress established an objective test to determine which households a satellite carrier could rebroadcast network programs.

In addition, the Magistrate concluded that even if the court considered legislative history, the result would be the same. The Report noted that Congress rejected a bill proposed by PrimeTime 24 and other satellite carriers that would have permitted viewers to receive network services by satellite if they submitted affidavits indicating that they did not receive adequate service over the air. *See* R & R at n. 16. Although Congress rejected this bill, PrimeTime 24 continues to argue to this Court that Congress meant to adopt such a standard. However, as noted by the Report, "[w]hen Congress has expressly considered and rejected a proposal to include particular provisions in a statute, 'there could hardly be [a] clearer indication' that a law does not have the meaning it would have had if the proposal had been accepted." R & R at 29–30 (citing *Tanner v. United States,* 483 U.S. 107, 125, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987)).

### c. Grade B Intensity

The Report also determined that the FCC defined "a signal of grade B intensity" in 47 C.F.R. § 73.683(a).[8] PrimeTime 24 disputes this and argues that the FCC never precisely defined a grade B signal; rather, the FCC's guidelines as stated in 47 C.F.R. § 73.683 only set forth median field strengths and contours, and have nothing to do with whether a household can receive a signal of grade

---

8. Section 73.683 provides:

(a) In the authorization of TV stations, two field strength contours are considered. These are specified as Grade A and Grade B and indicate the approximate extent of coverage over television stations. Under actual conditions, the terrain over any specific path is expected to be different from the average terrain on which the field strength charts were based. The required field strength, F (50, 50), in dB above one microvolt per meter (dBu) for the Grade A and Grade B contours are as follows:

| | GRADE A (dBu) | GRADE B (dBu) |
|---|---|---|
| Channels 2–6 | 68 | 47 |
| Channels 7–13 | 71 | 56 |
| Channels 14–69 | 74 | 64 |

(b) ... the curves should be used with appreciation of their limitations in estimating levels of field strength. Further, the actual extent of service will usually be less than indicate by these estimates due to interference from other stations. Because of these factors, the predicted field strength contours give no assurance of service to any specific percentage of receiver locations within the distances indicated. In licensing proceedings these variations will not be considered.

B intensity through a conventional rooftop antenna. *See* Obj. at 21.

The FCC acknowledges that true coverage or signal strength will vary greatly from its estimates. *See* 47 C.F.R. § 73.683 ("Under actual conditions, the true coverage may vary greatly from these estimates because the terrain over any specific path is expected to be different from the average terrain on which the field strength charts were based.") As particular households are the focus of the SHVA, PrimeTime 24 argues that a grade B intensity signal should be defined with the intent of Congress in mind—a signal that produces a picture with acceptable quality.

Although PrimeTime 24 is correct that there are limitations on how the FCC estimates a grade A and grade B signal, the code specifically states that the FCC will not consider variations when estimating a signal's strength. In particular, 47 C.F.R. § 73.684(a) states that "[a]ll predictions of coverage ... shall be made without regard to interference and shall be made only on the estimated field strength." Thus, although the FCC's method of estimating a grade B signal is imperfect, such imperfections are disregarded. *See* 47 C.F.R. § 73.683(b), *supra,* at n. 8.

In stating that the FCC shall define a signal of grade B intensity, Congress endorsed the FCC's method of determining such signals. That this was Congress' intent is supported by a House Judiciary Committee Report prepared a few weeks after it drafted the definition of "unserved household," which stated that a signal of grade B intensity *was as defined by the FCC, currently in 47 C.F.R. § 73.683(a).* H.R.Rep. No 100–887, pt. 1, at 26 (1988) (emphasis added).

■ PrimeTime 24 arguments in favor of a subjective test are essentially that signal intensity is not the proper standard by which to achieve Congress' objective in the SHVA. Whether Congress' has chosen the best standard, however, is not for the Court to decide. The duty of the Court is to construe statutes as Congress reasonably intended in accordance with its language. *See Caminetti,* 242 U.S. at 485, 37 S.Ct. 192; *Scrimgeour,* 636 F.2d at 1022.

■ Congress clearly defined a grade B signal based upon the FCC's objective standard and not on whether a household received acceptable picture quality. PrimeTime 24's emphasis on the latter runs contrary to the SHVA. Accordingly, the Court agrees with the Magistrate Judge's finding that the SHVA defines "unserved household" under the FCC's objective standard, and not on a particularized finding that "a" or "certain" households receive acceptable picture quality.

## 2. Evidence Establishing Likelihood of Success

■ Next, PrimeTime 24 argues that even if signal strength is the ultimate determinant of eligibility under the SHVA, Plaintiffs' evidence does not support injunctive relief. In particular, PrimeTime 24 attacks Plaintiffs Longley–Rice maps,[9] and the results of Plaintiffs' signal strength tests in the Miami area. PrimeTime 24 contends that this evidence was either inadmissable or unreliable. Furthermore, PrimeTime 24 maintains that its evidence, questionnaires from subscribers stating that they do not receive an acceptable picture over the air, sufficiently shows that its subscribers do not receive a grade B signal.

■ Under the SHVA, a satellite carrier such as PrimeTime 24, has the burden at trial of proving that its transmission of network programming goes only to "unserved households." 17 U.S.C. § 119(a)(5)(D). Although a party seeking a preliminary injunction bears the burden of showing likelihood of success on the merits, the court must consider that the ultimate burden of proof at trial is upon the nonmovant. *See Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 336–38 (5th Cir.1981) (in assessing likelihood of success on the merits, court took

9. As Magistrate Judge Johnson described in her Report, the Longley–Rice maps were created using the "Longley–Rice" propagation methodology. "This methodology was developed by U.S. government scientists, and now exists in the form of a computer program that can be obtained

from an agency of the U.S. Department of Commerce. The methodology takes into account detailed data about the terrain that surrounds a particular television broadcast tower" and can be used to measure the intensity of a signal from a particular television station. *See* R & R at 17.

into account nonmovants ultimate burden of proof.) Thus, as noted in the Report, Plaintiffs can establish likelihood of success on the merits by demonstrating that PrimeTime 24 is unlikely to prove at trial that its subscribers are "unserved households." *See* R & R at 30.

### a. PrimeTime 24's Evidence of Compliance with the SHVA

PrimeTime 24 has asserted that its efforts to comply with the SHVA demonstrate that Plaintiffs cannot succeed on the merits. PrimeTime 24 requires customer service representatives to ask all potential subscribers about their picture quality, and only sells its product to persons who state that they receive unacceptable pictures with a conventional rooftop antennae. *See* Obj. at 41. Furthermore, PrimeTime 24 states that it sends questionnaires to all of its subscribers who are challenged by the network stations, and only provides service to those subscribers who state that they receive unacceptable pictures. *See* Obj. at 41.[10] From this evidence, PrimeTime 24 argues that the Court should infer that its subscribers are among the people who do not receive a grade B signal.

The Magistrate Judge correctly rejected this argument. As the Report noted, "[t]here are a variety of reasons, unrelated to being an 'unserved household' why a customer might sign up for PrimeTime 24." R & R at 10. For instance, "viewers with access to additional network stations can watch network programs several hours later (or earlier) by watching a station from a distant time zone and can see sports programs (such as NFL football) that are not available locally." *Id.* In addition, subscribers to PrimeTime 24 receive many more television channels than with over-the-air antennas, without the need to install or maintain the antenna.

Furthermore, PrimeTime 24 again focuses on picture quality rather than on the FCC's objective test to determine whether a household is "unserved." As previously discussed, Congress established an objective test to determine which households a satellite carrier could rebroadcast network television without a license. The test is whether the household can receive a grade B signal as defined by the FCC. Asking potential subscribers about picture quality, simply fails to provide evidence that such subscribers fit within Congress' definition.

Although PrimeTime 24 contends that a subscriber' perception of picture quality is an indicator of whether a household receives a grade B signal, Plaintiffs' evidence shows otherwise. As the Report states, "the only reliable data before the Court shows a strong relationship between signal strength and picture quality." *See* R & R at 20. Accordingly, the Court agrees with the Magistrate Judge's determination that PrimeTime 24 has failed to produce evidence that its subscribers meet the statutory standard for "unserved households."

### b. Plaintiffs' Evidence of PrimeTime 24's Noncompliance with the SHVA

As a further reason why Plaintiffs cannot demonstrate a likelihood of success, PrimeTime 24 contends that Plaintiffs' Longley-Rice maps [11] were inadmissible evidence because the maps were hearsay under Fed. R.Evid. 802, and the expert testimony regarding the maps was inadmissible under Fed.R.Evid. 703. In addition, PrimeTime 24 disputes that Plaintiffs' signal strength tests at 100 locations in the Miami area were relevant because the testing methodology was flawed, and South Florida's topography is not representative of the Nation.

### i. The Longley-Rice Maps

PrimeTime 24's argument that the Longley-Rice maps were inadmissible hearsay is meritless because "[a]ffidavits and other hearsay materials are often received in preliminary injunction hearings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given

---

**10.** 17 U.S.C. § 119 requires PrimeTime 24 to provide each network a monthly list of all new subscribers receiving that network's programming. The network stations or their affiliates can then use those lists to "challenge" subscribers who they believe are not "unserved."

**11.** Defined, *supra* at n. 9.

the character and objectives of the injunctive proceeding." *Asseo v. Pan Am. Grain Co.,* 805 F.2d 23, 26 (1st Cir.1986); *See Levi Strauss,* 51 F.3d at 985; *McLaughlin v. Williams,* 801 F.Supp. 633, n. 10 (S.D.Fla. 1992) (Marcus, J.). Thus, even if the maps were hearsay, admission of the evidence was proper "giving due weight to the fact that [PrimeTime 24] did not have the opportunity to confront the declarant, and the need for expedition...." *McLaughlin,* 801 F.Supp. at n. 10.

■ In any event, the maps were not inadmissible hearsay. When expert testimony is offered, it is admissible if it is reliable and relevant. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 703 of the Federal Rules of Evidence provides that experts may rely upon facts or data that are not admitted into evidence at the hearing if such evidence is of a type reasonably relied upon by experts in the particular field.

In the instant matter, Plaintiffs' Longley–Rice maps were created by using two forms of technology: 1) the Longley–Rice propagation methodology which determined the signal strength of certain network affiliates and drew them onto a map of the area, and 2) Geocoding which pinpointed PrimeTime 24's subscribers onto the Longley–Rice maps. These maps thus demonstrated which of PrimeTime 24's subscribers could receive a grade A or B signal for a network affiliate in a given area.

The Magistrate Judge found that the Longley–Rice maps were relevant and reliable evidence. As the report stated,

"the 'Longley–Rice' propagation methodology ... was developed by U.S. government scientists, and ... now exists in the form of a computer program that can be obtained from an agency of the U.S. Department of Commerce. The Longley–Rice methodology takes into account detailed data about the terrain that surrounds a particular television broadcast tower. Longley–Rice maps thus provide the best available information, short of conducting actual field measurements, about the likelihood that a specific household can receive a signal of a particular intensity from a particular television station."

R & R at 17 (citations omitted).

As to geocoding, the Magistrate Judge found that the process

"uses subscriber addresses, in combination with a database of information from the U.S. Census and the U.S. Post Office, to provide detailed longitude and latitude information for specific subscribers. These subscribers are represented by the black dots on the map. The maps also contain reliable counts of the numbers of subscribers in the Longley–Rice Grade A and Grade B areas and in other defined areas."

R & R at 18.

The expert who testified as to the Longley–Rice maps, Mr. Jules Cohen ("Cohen") stated that he arranged for and supervised the creation of the Longley–Rice maps that were introduced as evidence, and that he had personal knowledge of how such maps were created. *See* Tr. 6/3/97, D.E. # 114, at 260 & 264. Cohen also testified that such maps were reasonably relied upon by experts in his field. *Id.* This information is sufficient for the Court to find that the maps were admissible as relevant and reliable evidence for the purposes of the Preliminary Injunction.

■ Next, PrimeTime 24 asserts that Cohen's testimony regarding the maps did not constitute admissible expert opinion because he did not rely upon personal knowledge, but instead only presented results of work performed for Plaintiffs by two other sets of people. Experts may generally rely upon facts or data that is reasonably relied upon by experts in the field. Fed.R.Evid. 703. Rule 703 was intended to "negat[e] the need to parade into court each and every individual either remotely or intimately involved ..." in an expert's testimony. *U.S. v. Abbas,* 74 F.3d 506, 513 (4th Cir.), *cert. denied,* 517 U.S. 1229, 116 S.Ct. 1868, 134 L.Ed.2d 965 (1996).

Cohen testified that the companies he used to create the maps were reasonably relied upon by experts in his field of broadcast engineering. Cohen also testified that he reviewed the maps and made corrections based upon his 50 years of expertise in broadcast engineering and his personal knowledge of the television markets around

the world. *Id.* at 264. This testimony is sufficient to warrant its consideration by the Magistrate Judge.[12]

### ii. Plaintiffs' Signal Strength Tests

In addition to Mr. Cohen's testimony, Plaintiffs presented evidence of signal strength tests taken at 100 locations in the Miami area. PrimeTime 24 contends that the signal strength tests were not probative evidence because the methodology used was inappropriate. Congress did not indicate the methodology that should be followed when measuring signal intensity; but rather intended that satellite carriers and broadcasters would agree to such standards. *See* Obj. at 36–37. PrimeTime 24 states that although there were negotiations, no agreement was reached. *Id.*

Plaintiffs used the measurement procedures set forth by the FCC in 47 C.F.R. § 73.686 for their signal strength tests. PrimeTime 24 argues that if Congress had meant for signal intensity testing to be measured by the procedures set forth in 47 C.F.R. § 73.686, it would not have left the formulation of the testing methodology to industry negotiations. PrimeTime 24 also argues that the methodology. Plaintiffs used for the signal tests were designed to produce the highest signal strength readings under ideal conditions.

PrimeTime 24's position that the signal strength tests were not probative is unavailing. PrimeTime 24's own expert used the testing procedures provided for in 47 C.F.R. § 73.686. Furthermore, since the SHVA states that the FCC should define a signal of grade B intensity, absent an industry agreement, the FCC's standard for measuring signal intensity is the most appropriate standard to utilize.

Plaintiffs signal strength test results were significant in that all of the 100 randomly tested subscribers received a signal of at least grade B intensity from both the CBS and Fox local affiliates. In fact, almost all 100 subscribers received a signal of Grade A intensity from both stations. *See* R & R at 18. These results are relevant even if the Miami's local terrain is flat. As the Magistrate Judge found, the Longley–Rice maps do consider the terrain in each location. The signal tests serve to underscore Plaintiffs' contention that PrimeTime 24 subscribers are not "unserved households," and as such the results are relevant. After considering all of Plaintiffs evidence and the record, the Court finds that there is sufficient evidence to support a finding that PrimeTime 24's services are not restricted to "unserved households."

### c. Willful or Repeated

Under the statute, however, a satellite carrier's delivery of network stations to unqualified households violates the SHVA only if it is either *"willfull"* or *"repeated."* 17 U.S.C. § 119(a)(5)(A) (emphasis added). PrimeTime 24 maintains that the Magistrate Judge erred in finding that its violations of the SHVA were willful or repeated.

The Magistrate Judge found that "to prove willfulness it is necessary only to show that a person knew it was doing the acts in question, not that the person knew those acts were wrong." R & R at 49 (citing 47 U.S.C. § 312(f)(1)) ("the term 'willful' ... means the conscious and deliberate commission or omission of [an] act, irrespective of any intent to violate any ... rule.") Furthermore, the Report noted that PrimeTime 24 has itself benefitted from this definition of the term willfulness when it obtained an award of damages for a defendant's unauthorized "willful" misappropriation of PrimeTime 24 transmissions. *PrimeTime 24 Joint Venture v. Telecable Nacional,* 1990 WL 598572 (D.N.J.1990); R & R at n. 18.

PrimeTime 24 maintains that the Magistrate's standard to determine wilfulness failed to consider Congress' recognition that possibilities of error would occur, and that damages should only be imposed if satellite

12. PrimeTime 24 also raises various other problems with Plaintiffs' reliance in the Longley–Rice model and maps including that: 1) the map incorrectly assumes that a conventional outdoor rooftop antenna is 30 feet in the air, 2) the maps ignore seasonal variations 3) the maps establish abstract probabilities, and 4) Plaintiffs failed to introduce evidence as to the accuracy of the maps' calculations. Even if PrimeTime 24 is correct that Longley–Rice maps make these errors in assumptions, this evidence goes only to the weight of the evidence, not to its admissibility.

carriers did not attempt to comply with the Act in good faith. PrimeTime 24 refers the Court to 17 U.S.C. § 119(a)(5)(A) which provides that a satellite carrier may avoid damages by "t[aking] corrective action [such as] promptly withdrawing service from the ineligible subscriber." However, as the Report noted, Section 119(a)(5)(A) refers only to damages, not with a request for injunctive relief as is before the Court.

Nevertheless, even if the "willful" standard required a finding of aggravated negligence, the Magistrate Judge also correctly determined that the evidence warranted such a finding. *See* R & R at 32. Plaintiffs' evidence indicates that PrimeTime 24 is broadcasting copyrighted network programming to hundreds of thousands of subscribers who receive a signal of grade B intensity as defined by Congress.

PrimeTime 24 has simply ignored the grade B test even though it "tried and failed to persuade Congress to adopt a test of eligibility based on subscriber statements about over-the-air reception." R & R at 32. The Magistrate Judge found that PrimeTime 24 was aware of the governing legal standard. In a mailing to subscribers regarding the SHVA, PrimeTime 24 stated that the Act imposes "a technical standard used by the [FCC] as an indicator of adequate service. Unfortunately, this technical standard often does not reflect the quality of the picture that you are actually getting on your television set." R & R at 12 (citing Def.Ex. 40). In addition, in efforts to persuade subscribers to write their legislative representative, PrimeTime 24 stated that "[u]nder the current law, your ability to view satellite network TV is based upon the intensity of the signal you receive from your local station, not based upon the quality of the picture on your TV set...."

This evidence demonstrates that Prime-Time 24 knew of the governing legal standard, but nevertheless chose to circumvent it.

**13.** The Court also rejects PrimeTime 24's unclean hands defense for the reasons stated in the Report at pages 33–36.

**14.** PrimeTime 24 also argues that it was not economically practical to test the signal strength at each subscriber's home, and that Congress contemplated no such thing. However, as discussed previously, Congress defined the term

Accordingly, the Magistrate Judge correctly rejected PrimeTime 24's protests of "good faith." [13] In sum, Plaintiffs evidence establishes a likelihood of success proving that PrimeTime 24 wilfully and repeatedly rebroadcast copyrighted network programming to served households in violation of the SHVA.[14]

**B. Irreparable Harm in Copyright Cases**

 The Magistrate Judge found that in copyright cases, once a plaintiff has established a likelihood of success, there is a presumption of irreparable harm. The majority of Circuits that have considered this issue have held that once a plaintiff establishes a prima facie case of copyright infringement, irreparable injury is presumed. *See* R & R at 36–39. Courts have applied this presumption in copyright cases because of "the unique nature of intellectual property and the difficulty of calculating damages after the fact." R & R at 37–38 (citing *Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1288–89 & n. 10 (10th Cir.1996)).

Although the Eleventh Circuit has not ruled on this issue, PrimeTime 24 states that the Fifth Circuit rejected this presumption prior to the split between the Fifth and Eleventh Circuits which occurred in *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981). In support, PrimeTime 24 cites to *Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc.,* 807 F.2d 1256, 1261 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987) where the Fifth Circuit held that a plaintiff must make some independent showing of irreparable injury in a copyright case to obtain a preliminary injunction. PrimeTime 24 maintains that *Plains Cotton* is binding on this Court because it cited *Southern Monorail Co. v. Robbins & Myers,* 666 F.2d 185 (5th Cir. Unit B 1982) which in turn referred to cases from district courts within the Eleventh Circuit.

"unserved household" based upon an objective test of signal strength. Although it may not be economical to test each potential subscriber, PrimeTime 24 cannot create its own definition of the term "unserved household" and supply its services to anyone who fits within that definition. In addition, whether it is economically practical to comply with the statute is not relevant.

However, in *Southern Monorail,* the Fifth Circuit stated that it "express[ed] no view [ ] upon whether a presumption of irreparable injury ... is appropriate once a party demonstrates a substantial likelihood of success on the merits of an infringement claim." *Southern Monorail,* 666 F.2d at 187–88. In fact, the Eleventh Circuit has held that "[i]n *Southern Monorail* the Fifth Circuit declined to rule on the issue [of the presumption of irreparable injury], since it disposed of the case on the balance of harm question." *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530 n. 14 & 1533–34 (11th Cir.1985). Thus, the Fifth Circuit's holding rejecting a presumption of irreparable harm once likelihood of success is established, is not binding on this Court. After a review of the Report, the Court agrees that the Magistrate Judge reached the appropriate conclusion that irreparable harm is presumed.

In any event, the Magistrate Judge considered Plaintiffs evidence and determined that they sufficiently demonstrated irreparable harm. *See* R & R at 39–46. PrimeTime 24 contends that it sufficiently rebutted the presumption of irreparable harm. In support, PrimeTime 24 states that 1) plaintiffs did not provide sufficient evidence of advertising losses, 2) any risk of loss to good will is highly speculative and created by Plaintiffs, and 3) any alleged inability of PrimeTime 24 to pay a potential damages award cannot be the basis for a preliminary injunction.

The Magistrate Judge considered these arguments as to irreparable injury and correctly determined that the harm caused by the loss of network and station advertising revenue and goodwill could be irreparable. The Court concurs with this finding.[15]

## C. Balance of Harms

The Report concluded that the balance of harms favor granting Plaintiffs an injunction for two reasons: 1) PrimeTime 24's contention that the injunction would place it out of business was conjectural, and 2) an injunction would not affect PrimeTime 24's revenue stream from its largest distributor—DirecTV. *See* R & R at 51–2. Furthermore, the Magistrate Judge concluded that a company cannot build a business on infringements and then argue that enforcing the law will cripple that business. *See* R & R at 52. In its objections, PrimeTime 24 simply argues that as Plaintiffs are not irreparably injured, the balance of harms do not favor injunctive relief. However, contrary to PrimeTime 24's assertions, Plaintiffs have demonstrated irreparable injury. Thus, the Court agrees that the balance of harms favor granting an injunction. *See* R & R 39–45.

## D. Public Interest

PrimeTime 24 also disputes whether the Report adequately considered the public interest. In brief, PrimeTime 24 argues that an injunction would negatively affect the legislative intent behind the SHVA, to provide network programming to unserved households. The Report concluded that Congress had already balanced the public interest against the need to protect the network-affiliate relationship, and in so doing, established an objective test to determine which households were "unserved." The Court agrees that "[i]t is not for this Court to alter the balance that Congress has struck in seeking to advance the public interest." R & R at 55. Therefore, despite PrimeTime 24's arguments to the contrary, it is evident that the public interest favors entry of the injunction.

## E. Manageability of the Injunction

In its final attempt to avoid an injunction, PrimeTime 24 contends that Plaintiffs' proposed injunction would be unmanageable. Plaintiffs have sought an injunction that would prevent PrimeTime 24 from retransmitting CBS or Fox network program-

---

**15.** PrimeTime 24 maintains that the Magistrate Judge incorrectly relied upon testimony from Plaintiffs' expert Preston Witherspoon Farr, who in turn relied upon a document that the Magistrate Judge excluded from evidence. The document presented data on the number of PrimeTime 24 subscribers in various markets.

PrimeTime 24, contends that any reliance on Mr. Farr's testimony was clear error. However, after considering the transcript and the Report, it is evident that the Magistrate Judge's reliance upon Mr. Farr's testimony did not depend on the specific numbers contained in the stricken exhibit.

ming to any customer within an area shown on a Longley–Rice propagation map as receiving a signal of at least grade B intensity without either 1) obtaining the written consent of a CBS or Fox primary network station and the relevant network, or 2) providing the station with a signal strength test of the subscriber's household showing that it cannot receive a signal of grade B intensity as established by the FCC.

PrimeTime 24 argues that such an injunction is unmanageable for several reasons. First, PrimeTime 24 argues that 99 percent of consumers who receive PrimeTime 24's signals are not PrimeTime 24's subscriber, but are instead subscribers of PrimeTime 24's distributors. Thus, enjoining Prime-Time 24 from distributing CBS and Fox signals to its subscribers is ineffective unless PrimeTime 24's distributors are involved. PrimeTime 24 maintains that since its distributors are not named in the complaint and are not PrimeTime 24's agents, the preliminary injunction would be difficult if not impossible to enforce.

Under Federal Rule of Civil Procedure 65(d), an injunction binds not only parties to the action, but also "officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." PrimeTime 24's distributors work in close concert with PrimeTime 24 in distributing its signals to consumers. As such, if the injunction did not apply to PrimeTime 24's distributors, the injunction would be effectively nullified. Accordingly, the Court finds that PrimeTime 24's distributors are "agents" of, or "persons in active concert or participation" with PrimeTime 24. In addition, the Court's preliminary injunction order shall set forth in reasonable detail, the act or acts to be restrained, and the persons to be restrained. *See* Fed.R.Civ.P. 65(d). Thus, any injunction against PrimeTime 24 would be applicable to its distributors.

Secondly, Prime Time 24 argues that the nationwide nature of the injunction presents

implementation and enforcement issues because of: 1) the topographical and other variations in the various local television markets across the country, 2) the Court lacks the institutional expertise and resources to supervise the injunction, 3) Plaintiffs have not provided Longley–Rice maps for approximately 80 percent of the local television markets in the United States, and 4) there is no consensus as to how signal intensity tests should be conducted.[16] Although these issues will make the enforcement of the preliminary injunction challenging, the Court will issue such orders as is necessary to enforce the injunction.

For these reasons, the Court rejects PrimeTime 24's position that the proposed injunction will be unmanageable.

### F. Bond

■ Magistrate Judge Johnson found that the preliminary injunction should issue without the posting of a bond. Although a court has the discretion to forego a bond, where an injunction may have severe consequences to a business, requiring the posting of a bond is prudent. Plaintiffs have as much as admitted that a bond would be appropriate. *See* Resp. at 45–46. Therefore, the Report is REVERSED on this issue, and the parties shall file papers within ten (10) days of this order addressing the amount of a reasonable bond. These papers shall not exceed twenty (20) pages in length.

### G. Magistrate Judge Johnson's Report and Recommendation

On a final note, PrimeTime 24 has suggested that this Court disregard Magistrate Judge Johnson's Report because she adopted material from Plaintiffs' proposed Report almost verbatim. PrimeTime 24 contends that it is disfavored for courts to adopt findings of fact and conclusions of law that are prepared by counsel of one of the parties. *See* Obj., D.E. # 156, at 16–19.[17]

■ However, the fact that a judge allowed a litigant to draft the court's orders

---

**16.** As discussed, *supra* at 1343–44, any signal strength tests should be conducted in conformance with the FCC's measurement procedures outlined in 47 C.F.R. § 73.686.

**17.** As support PrimeTime 24 cites *In re Colony Square,* 819 F.2d 272, 274 (11th Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988); *United States v. El Paso Natural Gas*

does not automatically invalidate those orders unless a party can demonstrate that the process by which the judge arrived at them was fundamentally unfair. *See In Re Colony Square Co. v. Prudential Ins. Co. of America,* 819 F.2d 272, 276 (11th Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988). Courts have counseled judged against signing orders that have been written by counsel of one of the parties because "of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor." *Anderson v. City of Bessemer,* 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

In the instant matter, the Magistrate Judge requested that *both* parties submit proposed findings of fact and conclusions of law *before* advising them of her decision. The parties, opposing submissions tempered any potential "overreaching."

In addition, as Plaintiffs note in their Response, one of the cases PrimeTime 24 relies upon to support its position specifically suggests the practice Magistrate Judge Johnson used. In *Bradley v. Maryland Cas. Co.,* 382 F.2d 415, 423–24 (8th Cir.1967) the Court stated that

> "if, because of prevailing custom, or pressure of work, or a case's technical nature ... counsel must be asked to assist in the preparation of findings and conclusions, it is better practice to make this request at or soon after the submission of the case and prior to decision and to make it of both sides. 5 Moore's Federal Practice (2d ed.1966) at 2665. Then the court may pick and choose and temper and select those portions which better fit its own concept of the case."

PrimeTime 24 admits that the Report did not adopt Plaintiffs' proposal without incorporating alterations that included several of PrimeTime 24's proposed findings of fact. Furthermore, the Magistrate Judge added some of her own material and omitted several paragraphs and footnotes contained in Plaintiffs' proposal. The Court is therefore satisfied that the Magistrate Judge arrived at her decision in through a fundamentally fair process. And after a thorough review of the Report, the Court largely concurs with the Report's recommendations.[18]

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** as follows:

1. Magistrate Judge Johnson's Report and Recommendation is **AFFIRMED in part** and **REVERSED in part.** The Magistrate's Finding of Facts and Conclusions of law are **ADOPTED** and Plaintiffs' Motion for Preliminary Injunction (D.E.# 45) is **GRANTED.** However, the Magistrate's determination that a bond is unnecessary is **REVERSED.** Therefore, the parties shall file a memorandum within ten (10) days of this order addressing the issue of a reasonable bond. These papers shall not exceed twenty (20) pages in length.

2. Plaintiffs' Motion for Immediate Ruling (D.E.# 182) is **DENIED as moot.**

3. PrimeTime 24's Motion to Strike Portions of Plaintiffs' Motion for Immediate Ruling (D.E.# 183) is **DENIED as moot.**

---

Co., 376 U.S. 651, 656, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) among other cases.

**18.** PrimeTime 24 also points out a few errors in the Report that supposedly illustrates her lack of conscientiousness. After considering PrimeTime 24's position, the Court finds that these errors were trivial and that they in no way undermine the validity of her decision.