[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT. 17, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-15378
_____

D. C. Docket Nos. 98-02651-CV-LCN
99-06382-CV-LCN

CBS BROADCASTING, INC.,
FOX BROADCASTING COMPANY,
ABC, INC.,
NATIONAL BROADCASTING CO.,
FBC TELEVISION AFFILIATES ASSOCIATION,
et al.,

Plaintiffs-Appellees,

versus

ECHOSTAR COMMUNICATION CORPORATION,
d.b.a. DISH Network,
ECHOSTAR SATELLITE CORPORATION,
SATELLITE COMMUNICATIONS OPERATING
CORPORATION,
DIRECT SAT CORP.,

Defendants-Appellants,

UNITED STATES OF AMERICA,

Intervenor.

ECHOSTAR COMMUNICATION CORPORATION,
a Nevada Corporation,

ECHOSTAR SATELLITE CORPORATION,
a Colorado corporation,
SATELLITE COMMUNICATIONS OPERATING
CORPORATION, a Colorado corporation
DIRECT SAT CORPORATION, a Delaware
corporation,

Plaintiffs-Appellants,

versus

CBS BROADCASTING INC., a New
York corporation,
FOX BROADCASTING, CO., a
California corporation,
NATIONAL BROADCASTING CO., a
New York corporation,
ABC, INC., a New York corporation,

Defendants-Counter-
Claimants-Appellees,

UNITED STATES OF AMERICA,

Intervenor.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 17, 2001)

Before ANDERSON, Chief Judge, BIRCH and WOOD*, Circuit Judges.
-------------------
        * Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by
designation.

ANDERSON, Chief Judge:

This is an interlocutory appeal from the entry of a preliminary injunction in a copyright infringement suit that was initiated by four major television network stations and associations representing hundreds of local network affiliates against EchoStar Satellite Company and its subsidiaries. The propriety of the preliminary injunction depends in large part upon the Satellite Home Viewer Act ("SHVA"), 17 U.S.C. § 119, and its most recent amendments in the Satellite Home Viewer Improvement Act of 1999 ("Improvement Act" or "the Act"), Pub. L. No. 106-133, § 1001, et seq., 113 Stat. 1537, 515 (West Supp. 2001). SHVA, as amended by the Improvement Act, creates a compulsory, statutory license for satellite carriers to transmit copyrighted network programming for private home viewing to "persons resid[ing] in unserved households." 17 U.S.C. § 119 (1996 & West Supp. 2001). The district court found, inter alia, that there was a substantial likelihood that the Networks could establish that EchoStar provides distant network signals to "served" residences thereby falling outside of the Act and violating the Networks' copyrights. Because we conclude that this finding was an abuse of discretion, we vacate the preliminary injunction and remand for further proceedings consistent with this opinion.

**BACKGROUND**

3

## A. Factual Background

CBS Broadcasting, Inc. ("CBS"), Fox Broadcasting Company ("Fox"), ABC, Inc., National Broadcasting Co., CBS Television Network Affiliates Association, FBC Television Affiliates Association, ABC Television Affiliates Association, and NBC Television Affiliates are the respective owners of the CBS, Fox, ABC, and NBC television networks, and are the trade associations representing hundreds of CBS, Fox, ABC, and NBC affiliate stations. The Networks own the copyright or exclusive rights in numerous television programs broadcast by CBS, Fox, ABC, and NBC network stations. EchoStar Communications Corporation and its subsidiaries, EchoStar Satellite Corporation, Satellite Communications Operating Corporation, and Direct Sat Corporation (collectively "EchoStar"), provide satellite television programming to over five million Americans under the name "DISH Network."

During the 1990's, EchoStar began providing satellite television programming to subscribers with small (18 inch) satellite dishes. To provide such programming, EchoStar contracted with PrimeTime 24 Joint Ventures ("PrimeTime") to obtain distant network signals.[1]

---

[1] The phrase "distant network programming" or "distant network signals" refers to network programming that is not from a subscriber's local market. For example, distant network signals would be utilized, and distant network programming would be provided, when a satellite provider transmits NBC programming from a Chicago affiliate to subscribers in another television market such as Macon, Georgia.

In December 1996, in the district court for the Southern District of Florida, CBS, Fox, and various CBS affiliates sued PrimeTime, asserting that PrimeTime was infringing on the networks' copyrights by transmitting network material to individuals who did not qualify as "unserved" (herein "PrimeTime litigation"). See CBS, Inc., v. PrimeTime 24 Joint Venture, 245 F.3d 1217 (11th Cir. 2001). By orders dated May 13, 1998, and July 19, 1998, the district court preliminarily and permanently enjoined PrimeTime from "deliver[ing] CBS or Fox television network programming to any customer that does not live in an 'unserved household' as defined in" SHVA. See CBS, Inc. v. PrimeTime 24 Joint Ventures, 9 F. Supp. 2d 1333 (S.D. Fla. 1998) (preliminary injunction) (CBS I); CBS Broadcasting v. PrimeTime 24 Joint Venture, 48 F. Supp. 2d 1342 (S.D. Fla. 1998) (permanent injunction) (CBS II).[2]

On July 20, 1998, the day after the permanent injunction in the PrimeTime litigation was entered, EchoStar announced publicly that it would be providing its own package of distant network programming. EchoStar created two such packages to include signals from ABC, CBS, Fox, and NBC affiliates in New York City and

_____

[2] After the permanent injunction was entered, PrimeTime moved the district court to modify the order to account for the C-band grandfathering provision promulgated with the passage of the Improvement Act. See 17 U.S.C. § 119(a)(2)(B)(iii) (West Supp. 2001). The district court granted PrimeTime's motion by interpreting the C-band provision, and PrimeTime appealed. We addressed the propriety of the court's interpretation of § 119(a)(20(B)(iii) in CBS, Inc., 245 F.3d 1217.

Los Angeles.

At that time, EchoStar also implemented its own screening process for new customers to ensure SHVA compliance.[3]  First, EchoStar hired an independent engineering firm to provide a nationwide "red light/green light" database that uses the Longley-Rice predictive model to predict Grade A and Grade B signal intensity within specific zip codes.  In screening prospective subscribers, EchoStar scanned their zip-code to determine whether the subscriber resided in a red or green light area, i.e., whether the residence was predicted to receive a Grade A or B intensity.  If predicted to reside in a Grade A or B contour, the subscriber was allegedly refused distant network services unless that subscriber obtained a waiver from the local network affiliate or a professionally administered signal intensity test indicating that the residence does not receive a Grade A or B signal from the network affiliates in that market.

Beginning sometime after February 1999, EchoStar hired Dataworld, a second independent engineering firm, to construct a Grade A/Grade B database

---

[3] Much of the PrimeTime litigation centered around PrimeTime's efforts to ensure SHVA compliance.  PrimeTime's practice had been to rely on subscriber's subjective representations regarding the qualify of their television picture.  Various courts found this subjective inquiry to be insufficient under SHVA, which utilizes an objective standard for judging a subscriber's signal intensity.  See 17 U.S.C. § 119(d)(10)(A) (setting Grade B intensity as the standard); ABC, Inc. v. PrimeTime 24, 184 F.3d 348 (4th Cir. 1999) (holding PrimeTime's subjective inquiry to be unlawful); CBS II, 48 F. Supp. 2d 1342 (same); CBS I, 9 F. Supp. 2d 1333 (same).

using the Individual Location Longley-Rice propagation model ("ILLR model").
This database was provided to EchoStar sometime in 1999, and upon receipt of the software, EchoStar alleges that it has run all prospective subscribers through the ILLR model in the same manner that it utilized the red light/green light database. Finally, in 1999, EchoStar began negotiations with Decisionmark Corporation, a third independent engineering firm, to provide ILLR testing for all of EchoStar's pre-July 1998, PrimeTime-derived subscribers to confirm their eligibility under SHVA.

## B. Procedural Background

On October 19, 1998, EchoStar filed a declaratory judgment action against the Networks in the United States District Court for the Southern District of Colorado, Case No. 98-CIV-02285, seeking a declaration that it was complying with SHVA. The Networks did not respond initially in the Colorado litigation.

Instead, on November 5, 1998, the Networks filed a complaint in the United States District Court for the Southern District of Florida alleging that EchoStar was infringing on the Networks' copyrights by providing distant network programming to "served" households. A few days later, on November 9, 1998, the Networks filed a motion in the Colorado district court to transfer EchoStar's declaratory judgment action to the Southern District of Florida. The Colorado district court granted the

Networks' motion to transfer on March 29, 1999, and on April 28, 2000, the Colorado litigation was consolidated with the Networks' copyright infringement suit in the Southern District of Florida.

Meanwhile, on December 2, 1998, the Networks filed a motion for a preliminary injunction in the Southern District of Florida seeking to enjoin EchoStar from infringing on its copyrights. By written motion, EchoStar requested an evidentiary hearing and requested the court to compel the Networks to comply with its discovery requests. The district court did not respond to these motions, but set oral argument on the Networks' preliminary injunction motion for September 21, 1999.

Oral argument was held on September 21, 1999, and on September 29, 2000, the district court granted the Networks' motion for a preliminary injunction against EchoStar. In the order granting the preliminary injunction, the court denied EchoStar's requests for an evidentiary hearing and motions to compel.

Finding all four prerequisites for a preliminary injunction satisfied, the district court enjoined EchoStar from transmitting distant network programming to "served households" within the meaning of SHVA. Specifically, the court first found that there was a substantial likelihood that the Networks' copyright infringement suit would succeed because the evidence demonstrated that EchoStar

"likely provides distant network transmissions to numerous households which are not 'unserved'" and EchoStar's violations of SHVA are willful and repeated. Second, the court found that "[b]ecause the network parties have established that they are likely to prevail on the merits, they are entitled to a presumption of irreparable injury." Third, the court weighed the equities, finding that the potential injuries to the Networks should the injunction not issue outweighed any injury to EchoStar that could occur from issuance. Lastly, the court reasoned that the preliminary injunction would not disserve the public interest because the public interest lies with protecting the rights of copyright owners. Finding the four prerequisites satisfied, the court granted the Networks' motion, directing EchoStar to terminate distant network programming to "served households."

In addition to entering the preliminary injunction, the court interpreted 17 U.S.C. § 119(e). The parties disputed whether this provision enables a subscriber to transfer to a different satellite provider with his or her grandfathered rights under § 119(e). The court found that § 119(e) was ambiguous and resorted to legislative history to interpret it. Based on the Conference Committee Report accompanying the Improvement Act, the district court concluded that "grandfathered status is not transferable to a different [satellite] carrier . . ."

EchoStar timely filed an interlocutory appeal from the court's order. On

November 22, 2000, this Court, upon motion of EchoStar, stayed the preliminary

injunction pending appeal and, <u>sua sponte</u>, we expedited consideration of this case.

On appeal, we have granted three motions to file amicus curiae briefs.[4]  Pursuant to

28 U.S.C. § 2403(a), we also granted the Department of Justice's motion to

intervene as a matter of right to defend the constitutionality of the Act.

## A.  SHVA & The Improvement Act

The Satellite Home Viewers Act ("SHVA") was enacted in November 1988,

<u>see</u> Pub. L. 101-667, Title II, § 202(2), 102 Stat. 3949, and was amended by

Congress in 1993, 1994, 1995, and 1997.  SHVA creates a compulsory, statutory

license for satellite carriers to retransmit copyrighted network programming for

private home viewing to "persons resid[ing] in unserved households" without the

consent of the copyright owner.  17 U.S.C. § 119(a)(2)[5] (1996).  The satellite

---

[4] Specifically, we granted the National Association of Broadcasters and the Satellite Broadcasting and Communication Association leave to file amicus curiae briefs, as well as the joint motion of the Consumer Federation of America and Media Access to file a joint amicus curiae brief.

[5]As to network stations, SHVA provides:

**(A) In general.** –Subject to the provisions of subparagraphs (B) and (C) of this paragraph and paragraphs (3), (4), (5), and (6) of this subsection, secondary transmissions of programming contained in a primary transmission made by a network station and embodying a performance or display of a work shall be subject to statutory licensing under this section if the secondary transmission is made by a satellite carrier to the public for private home viewing, and the carrier makes a direct or indirect charge for such retransmission service to each subscriber receiving the secondary transmission.
**(B) Secondary transmissions to unserved households**.– The statutory license

carrier's license is limited to "unserved households," which SHVA describes as a

residence that:

> (A) cannot receive, through the use of a conventional, stationary,
> outdoor rooftop receiving antenna, an over-the-air signal of a primary
> network station affiliated with that network of Grade B intensity (as
> defined by the Federal Communications Commission) of a primary
> network station affiliated with that network, and
> (B) has not, within 90 days, before the date on which that household
> subscribes, . . . subscribed to a cable system that provides the signal of
> a primary network station affiliated with that network.

Id. at (d)(1) (1996). For SHVA's statutory license to extend to a satellite

subscriber, the residence must satisfy the objective requirements for "unserved

household." See PrimeTime 24 Joint Ventures v. National Broadcasting, Co., Inc.,

219 F.3d 92, 96 (2d Cir. 2000) ("the SHVA establishes a relatively objective signal-

strength rule rather than a subjective rule of reception quality"); ABC, Inc. v.

PrimeTime 24, 184 F.3d 348, 353 (4th Cir. 1999) ("The very terms of the SHVA

define eligible households by means of an objective, measurable standard."); CBS

II, 48 F. Supp. 2d at 1355.

SHVA's statutory license was set to expire in 1999 and throughout the year

Congress considered an extension of, and changes to, the statutory license. "After

both houses of Congress passed differing bills amending SHVA, a conference

---

> provided for in subparagraph (A) shall be limited to secondary transmissions to
> persons who reside in unserved households.

17 U.S.C. §§ 119(a)(2)(A) and (B).

11

committee negotiated what became the [ Satellite Home Viewers Improvement Act of 1999]." PrimeTime 24, 245 F.3d at 1220. The Improvement Act was ultimately passed by Congress and signed into law by President Clinton on November 29, 1999. See Pub. L. No. 106-113, § 1001, et seq., 113 Stat. 1536, 515 (1999).

The Improvement Act renews SHVA's existing statutory copyright license and, among other things, the Act further defines the scope of the license for retransmission of network programming. See, e.g., 17 U.S.C. § 119(a)(2)(A)-(C) (West. Supp. 2001). Significantly, Congress altered the definition of an "unserved household" by amending § 119(d)(10) to read:

> The term "unserved household," with respect to a particular television network, means a household that –
>     (A) cannot receive, through the use of a conventional, stationary, outdoor rooftop receiving antenna, an over-the-air signal of a primary network station affiliated with that network of Grade B intensity as defined by the F[CC] . . . under section 73.683(a) of title 47 of the Code of Federal Regulations, as in effect on January 1, 1999;
>     (B) is subject to a waiver granted under regulations established under section 339(c)(2) of the Communications Act of 1934 [47 U.S.C.A. § 339(c)(2)];
>     (C) is a subscriber to whom subsection (e) applies;
>     (D) is a subscriber to whom subsection (a)(11) applies; or
>     (E) is a subscriber to whom the exemption under subsection (a)(2)(B)(iii) applies.

Id. at § 119(d)(10). With the Improvement Act, eligibility as an "unserved household" is now three-fold. A private residence qualifies as "unserved" if it: 1) is predicted to receive less than a Grade B signal intensity, 2) receives a waiver from

12

the local television network station to receive distant network programming, or 3) is grandfathered or otherwise exempted by the express terms of the statute[6].  See id.

The Improvement Act not only redefines "unserved households" but it further refines the methodology used to determine the signal intensity at a specific location. Specifically, Congress added § 119(a)(2)(B)(ii)(I), which explains that:

> In determining presumptively whether a person resides in an unserved household under subsection (d)(10)(A), a court shall rely on the Individual Location Longley-Rice model set forth by the Federal Communications Commission in Docket No. 98-201, as that model may be amended by the Commission over time under section 339(c)(3) of the Communications Act of 1934 [47 U.S.C.A. § 339(c)(3)] to increase the accuracy of that model.

17 U.S.C. § 119(a)(2)(B)(ii)(I) (West Supp. 2001).  This provision allows a satellite provider to establish presumptively that a subscriber qualifies as "unserved" where the ILLR model, as set forth by the Federal Communications Commission[7] ("FCC"), establishes that the residence cannot receive an over-the-air signal of a primary network station of Grade B intensity.  See id.  Under the Improvement Act,

---

[6] For example, § 119(a)(11) extends the license to certain recreational vehicles, while § 119 (a)(2)(B)(iii) grandfathers certain C-band subscribers, and § 119(e) grandfathers certain subscribers whose services were terminated or received during a specific period.

[7] When passing the Improvement Act in 1999, Congress also promulgated 47 U.S.C. § 339(c)(3), which requires the FCC to "take all actions necessary, including any reconsideration, to develop and prescribe by rule a point-to-point predictive model for reliably and presumptively determining the ability of individual locations to receive signals in accordance with the signal intensity standard in effect under section 119(d)(10)(A)."  47 U.S.C. § 339(c)(3) (West Supp. 2001).

if the ILLR model predicts that a household cannot receive a signal of Grade B intensity or better, the home is "unserved" under § 119(a)(10)(A), and the Act's narrow statutory license extends to that residence.

## DISCUSSION

EchoStar argues that the district court erred in entering a preliminary injunction that does not satisfy the four prerequisites and is overly broad. Further, it contends that the Improvement Act and SHVA violate the First Amendment, and that the district court erred in interpreting § 119(e). We address each argument in turn.

### A. Standard of Review

We review the district court's findings of fact under a clearly erroneous standard, and its conclusions of law de novo. See SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1333 (11th Cir. 1996). The district court's preliminary injunction will be reversed only upon a showing of abuse of discretion. See Siegel v. LePore, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc) (citing cases). This means that "we must affirm unless we at least determine that the district court has made a 'clear error of judgment,' or has applied an incorrect legal standard.'" SunAmerica, 77 F.3d at 1333.

A district court may grant a preliminary injunction only upon the movant's

showing that: (1) it has a substantial likelihood of success on the merits; (2) the movant will suffer irreparable injury unless the injunction is issued; (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party; and (4) if issued, the injunction would not disserve the public interest. Siegel, 234 F.3d at 1176. It is well-established in this Circuit that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to all four elements. Id. (citing cases).

## B. Substantial Likelihood of Success

To satisfy this prong, the Networks bore the burden of demonstrating a substantial likelihood of success on its copyright infringement claims. See, e.g., Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1026 (11th Cir. 1989) (a "preliminary injunction require[s] that [the movant] demonstrate a substantial likelihood of success on the merits of its infringement claim").

Owners of copyrights in television programs enjoy the exclusive right to "publicly perform" those programs and to license others to do so. See 17 U.S.C. § 106(4) (1996). There is no dispute that the Networks own the exclusive copyrights in the numerous network television programs that EchoStar retransmits to certain subscribers. There is likewise no dispute that EchoStar is a satellite television

15

carrier under SHVA, see 17 U.S.C. § 119(d)(6), and is entitled to the compulsory, statutory copyright license to retransmit distant network programming to viewers without the Network's permission if the satellite subscriber qualifies as an "unserved household," see id. at §§ 119(a)(2)(A), (a)(2)(B)(ii), & (d)(10). Here, the controversy centers around whether EchoStar's distant network subscribers are actually "unserved."

Accepting EchoStar's proffer of evidence, the district court found that the "record evidence demonstrate[d] that EchoStar transmits distant network signals to a significant number of households which are not unserved." Based on this finding, the court held that the Networks established a substantial likelihood of success on their petition for relief under the Copyright Act.

**1. Burden of Proof & Statutory Presumption to Determine "Unserved Household"**

First, EchoStar argues that the Networks failed to satisfy its burden of demonstrating that there is a substantial likelihood that it can establish EchoStar's violations of SHVA and the Improvement Act. The Networks counter that under 17 U.S.C. § 119(a)(5)(D) EchoStar has the burden of demonstrating that its distant network subscribers are "unserved."

Resolving this, the district court reasoned that "[a]lthough the network parties

16

bear the burden of proof on their motion for preliminary injunction, 'the court must consider that the ultimate burden of proof at trial is upon the nonmovant.'" Thus, the court concluded that the Networks could "'establish likelihood of success on the merits by demonstrating that [EchoStar] is unlikely to prove at trial that its subscribers are 'unserved households.'"

In the 1994, Congress added § 119(a)(5)(D) to SHVA, providing that:

> In any action brought under this paragraph, the satellite carrier shall have the burden of proving that its secondary transmission of a primary transmission by a network station is for private home viewing to an unserved household.

17 U.S.C. § 119(a)(5)(D) (1996). This provision places the ultimate burden of demonstrating SHVA eligibility on the satellite carrier. While the satellite carrier is harnessed with the ultimate burden at trial, it is well-settled that in a preliminary injunction posture the movant must always bear the burden of demonstrating the four prerequisites. See e.g., Siegel, 234 F.3d at 1176. In resolving how to allocate these burdens, the mechanics of the Improvement Act are illustrative.

The Improvement Act allows parties to establish "presumptively whether a person resides in an unserved household . . . ," through the ILLR predictive model, as it may be amended by the FCC. 17 U.S.C. § 119(a)(2)(B)(ii)(I) (West Supp. 2001). In establishing the presumption, the provision specifically directs that "courts shall rely on the I[LLR] . . . model" as the FCC may revise it. See id. As a

17

corollary to this, the Improvement Act amends SHVA's reporting requirements by requiring that:

> satellite carrier[s] that make[ ] secondary transmissions of a primary transmission . . . by a network station pursuant to subparagraph (A) shall, 90 days after commencing such secondary transmissions, submit to the network that owns or is affiliated with the network station a list identifying (by name and street address, including county and zip code) all subscribers to which the satellite carrier makes secondary transmission of that primary transmission.

17 U.S.C. § 119(a)(2)(C) (West Supp. 2001).[8]

Utilizing the Improvement Act's paradigm in a preliminary injunction posture, the district court should on remand require the Networks to adduce sufficient evidence to apply the § 119(a)(2)(B)(ii)(I) presumption based on the records submitted to it by EchoStar under § 119(a)(2)(C)'s reporting requirements. While SHVA and the Improvement Act place the ultimate burden of proof at trial on the satellite carrier, see 17 U.S.C. § 119(a)(5)(D), the fixed principle in the

---

[8]Section 119(a)(2)(C) further explains the reporting requirements as follows:

Thereafter, on the 15th of each month, the satellite carrier shall submit to the network a list identifying (by name and street address, including county and zip code) any persons who have been added or dropped as such subscribers since the last submission under this subparagraph. Such subscriber information submitted by a satellite carrier may be used only for purposes of monitoring compliance by the satellite carrier with this subsection. The submission requirements of this subparagraph shall apply to a satellite carrier only if the network to whom the submissions are to be made places on file with the Register of Copyrights a document identifying the name and address of the person to whom such submissions are to be made. The Register shall maintain for public inspection a file of all such documents.

18

preliminary injunction context is that the proponent of a such an injunction must always make the prima facie showing of substantial likelihood of success on the merits, see Siegel, 234 F.3d at 1176.

The principle guiding us is this: Where the ultimate burden of proof at trial is on the non-movant, the party seeking a preliminary injunction must nonetheless make some prima facie showing before the burden of production or proof shifts to the non-movant. See generally Deerfield Med. Ctr. V. City of Deerfield Beach, 661 F.2d 328, 336-38 (5th Cir. 1981)[9]. In litigation involving the Improvement Act, the movant may do this by applying the statutory presumption, and thereby demonstrating that a substantial number of the satellite carrier's subscribers presumptively fall outside of the narrow copyright license created by SHVA and the Improvement Act. See 17 U.S.C. § 119(a)(2)(B)(ii)(I). Pragmatically, this task should not be onerous because the satellite carrier is required under § 119(a)(2)(C) to submit its subscriber lists to the networks. See id. at (a)(2)(C). Based on such data, a network should be able to demonstrate which subscribers are presumptively served and unserved. Once presumptive noncompliance is established, the non-movant or satellite carrier may rebut the presumption with, for example, evidence of

_____

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

19

signal strength tests or waivers from local affiliates. Such a burden-shifting model ensures that the party opposing a preliminary injunction is not saddled with the burden of production, initially, and that the proponent of this "extraordinary and drastic remedy" is required to "clearly establish the 'burden of persuasion' as to the four requisites," Siegel, 234 F.3d at 1176.

Here, the court examined the Network's proffer of Jules Cohen's declaration. The court concluded that it "w[ould] not rely on Mr. Cohen's maps or his Declaration testimony" because Cohen's maps "overstate the number of unserved households to which EchoStar transmits distant network programming" by relying on an outdated code provision. The Cohen evidence was the only evidence proffered by the Networks' to carry their initial burden.[10]

Having rejected the only evidence adduced by the Networks, the court turned to EchoStar's submission of Michael R. Hawkins's declaration and five supporting ILLR maps of Chicago, San Francisco, Washington, D.C., Dallas-Fort Worth, and Memphis. For purposes of the injunction, the court concluded it would "accept as accurate Mr. Hawkins's Declaration testimony and his analysis of the ILLR maps." Based thereon, the court found that "in five designated market areas, EchoStar

---

[10] The Networks suggest that the district court did rely on Cohen's declaration. This contention is unpersuasive, however, in light of the district court's express statement that it "w[ould] not rely on Mr. Cohen's maps or his Declaration testimony."

likely provides distant network programming to thousands of households which are not 'unserved.'"[11] The court found that Hawkins' declaration established that "at least 9,956 people in five markets – i.e., 25.27% of EchoStar's 39,397 subscribers in those markets – receive a signal of Grade B intensity or higher, and presumptively do not reside in unserved households." Based on Hawkins's declaration, the court found it presumptively established that at least 25.27% of EchoStar's customers were "served," and that there was a substantial likelihood that the Networks could demonstrate that EchoStar was presumptively violating the Act.

The district court's approach was not much different than the burden-shifting model suggested above. The flaw we find, however, in the district court's analysis is its finding that the predicate burden is satisfied by evidence pertaining only to five markets that were tested by Hawkins. We conclude that the district court's extrapolation from these five markets to draw conclusions about satellite

---

[11] Specifically, the district court found Hawkins's maps to indicate that: 1) 39.33% of EchoStar's Chicago area subscribers, or rather, 2,171 households receive a signal of Grade B intensity or stronger; 2) 44.48% of EchoStar's San Francisco area subscribers, or rather, 4,451 households receive a signal of Grade B strength or stronger; 3) 3.07% of EchoStar's Washington, D.C. area subscribers, or rather, 321 households receive a signal of Grade B strength or stronger; 4) 32.72% of EchoStar's Dallas-Fort Worth area subscribers, or rather, 2, 659 households receive a signal of Grade B strength or stronger; and 5) 7.01% of EchoStar's Memphis area subscribers, or rather, 354 households receive a signal of Grade B strength or stronger.

subscribers in two-hundred and thirty nationwide markets is not supported by the record.[12]  There is no evidence in the instant record that the five markets are representative of Echostar's nationwide service, nor do the Networks point to other evidence that the district court's extrapolation is reasonable.[13]

## 2. Willful or Repeated Infringement

Networks may sue satellite carriers under the Improvement Act where the satellite carrier's violations of the Act are "willful or repeated."  See 17 U.S.C. §§ 119(a)(5)(A) & (B).  Here, the district court found that there was a substantial likelihood that the Networks would be able to demonstrate willful and repeated violations because of: (1) EchoStar's belated submission of ILLR maps, (2) the twenty-percent rule, and (3) EchoStar's failure to demonstrate corrective action. EchoStar appeals all three conclusions, arguing that the Networks failed to

---

[12] We pause to note that the Networks possess the tools to produce the evidence we require.  As explained above, the statutory presumption is available to the Networks, which enables them to tag a presumptive label on Echostar's subscribers, as either served or unserved. Because Echostar is and has been required to submit its subscriber lists to the Networks, see 17 U.S.C. § 119(a)(2)(C), the Networks should have the information necessary to apply the statutory presumption.  We assume the Networks have such data, lest they would have alleged an infringement based on noncompliance with the reporting requirements.  See 17 U.S.C. §119(a)(3) (making noncompliance with reporting and payment requirements actionable as an act of infringement).

[13] The Networks suggest that we should infer that the five markets are representative merely because Echostar offered the Hawkins evidence.  However, the record does not support the assertion that Hawkins or Echostar asserted or conceded that the five markets were representative.

demonstrate that its violations were willful or repeated.

### a. Delay in Submitting ILLR Maps

The district court found that Hawkins' declaration established willful and repeated violations of the Act. First, the court reasoned that, in May of 1998 in CBS I, the district court for the Southern District of Florida established the ILLR model as the proper litmus for determining presumptively whether a subscriber qualifies as "unserved." The court reasoned that the ILLR model was thereafter adopted by the FCC by written Report and Order in February 1999, and that Congress followed suit in July 1999 by promulgating the § 119(a)(2)(B)(ii)(I) presumption based on the ILLR model. Because EchoStar did not begin generating ILLR maps until approximately September of 1999, the court found that "[t]his delay demonstrates a willful desire to avoid compliance with the [Act]."

We find that the district court erred in inferring a willful desire to avoid compliance from the evidence in this record. On December 2, 1998, the Networks submitted Cohen's declaration with supporting Longley-Rice maps as support for its motion for a preliminary injunction. A little over a month later, on January 15, 1999, the Networks submitted the supplemental declaration of Cohen utilizing the Longley-Rice model. Weeks later, on February 1, 1999, the FCC issued a Report and Order in the matter of Satellite Delivery of Network Signals to Unserved

23

<u>Hosueholds for Purposes of the Satellite Home Viewer Act</u>, CD Docket No. 98-201

(FCC February 1, 1999) ("February Order"), embracing the ILLR model for

determining signal intensity at individual locations.[14]  Responding to the February

1999 Report, the Networks, on July 12, 1999, submitted Cohen's second amended

affidavit with supporting ILLR maps.  A little over two months later, on September

20, 1999, EchoStar submitted the declaration of Hawkins, with supporting ILLR

maps.

We reverse the district court's finding of willful and repeated violations on

this ground as an abuse of discretion because EchoStar's delay was not significant,

as compared to the Networks' own actions, and there is no record evidence to

support the court's inference.  First, it took the Networks over five months to

compile ILLR maps and models, and it took EchoStar only two months thereafter to

submit its ILLR maps in rebuttal.[15]  Second, Hawkins' affidavit attests to the fact

that EchoStar attempted to employ the ILLR model, and that despite difficulties and

delays in obtaining the computer software needed to utilize this technology,

EchoStar began generating ILLR maps as soon as EchoStar could adapt the

---

[14] Adoption of this new testing method is, and was, central to this dispute because SHVA and the Improvement Act make Grade B intensity the benchmark for determining whether a household is "unserved."  <u>See</u> 17 U.S.C. § 119(a)((2)(B)(ii)(I) (West Supp. 2001).

[15] The Networks did not complete and submit to the court its ILLR results until July 12, 1999, while the ILLR model was adopted on February 1, 1999.

software to its subscriber base.[16] The only way that the court could have found a dilatory motive in the face of such statements is by finding Hawkins' statements to be untrue, and inferring from the circumstances, i.e., the amount of time it took EchoStar took to submit ILLR maps, that EchoStar had a willful desire to avoid compliance with the Act. "[I]nference[s] based on speculation and conjecture [are] not reasonable." Chapman v. American Cyanamid Co., 861 F.2d 1515, 1518 (11th Cir. 1988). Here, the court inferred a willful desire to avoid compliance with the Act from Hawkins' comments and explanations for EchoStar's delay in utilizing workable ILLR maps. EchoStar's difficulty in employing the ILLR technology does not, on this record and without an evidentiary hearing, establish willful or repeated violations of the Act, and we reverse the district court's conclusion to the contrary.

## b. Twenty-Percent Rule

Second, the court used the twenty-percent rule to find a substantial likelihood

---

[16] Specifically, in his affidavit submitted to the court on September 20, 1999, Hawkins explains that:

> EchoStar has experienced some delays in incorporating the ILLR model endorsed by the FCC, in part, because of the length of the cue at DataWorld. As a result, in part, of these delays, EchoStar only recently obtained from DataWorld its ILLR data, implementing the ILLR model endorsed by the FCC. . . . Once EchoStar received this ILLR data from DataWorld, EchoStar still had to geocode its subscribers (a substantial task) before using the data to determine whether EchoStar's subscribers are eligible to receive distant network programming via satellite.

Hawkins' Affidavit ¶ 8.

that the Networks could demonstrate willful and repeated violations. The twenty-percent rule, derived from the 1988 legislative history of § 119(a)(5) provides that:

> In view of the possibilities for error which would occur despite reasonably diligent efforts to avoid them (because of variables such as consumer self-reporting and engineering tests of signal adequacy) it is the intent of this statute that no pattern or practice be found if, excluding subscribers grandfathered under section 119(a)(5)(C), less than 20% of the subscribers to a particular network station (on either local, regional, or national bases) are found ineligible.

H.R. Rep. No. 100-887(I), at 19 (1988), reprinted in, 1988 U.S.C.C.A.N. 1511, 5622. The district court reasoned that a "substantial percentage (25.57%) of EchoStar's subscribers in the five markets who Mr. Hawkins's ILLR maps predict do not reside in unserved households, combined with the lack of evidence regarding waivers or field test results, supports a finding of a willful and repeated pattern or practice of infringement."

EchoStar argues that the Networks submitted no reliable evidence, let alone signal strength tests, to demonstrate that at least 20% of the contested subscribers are actually served. It argues that because the district court aggregated the five test markets in Hawkins' declaration, instead of considering each individual network station, the court misapplied the rule. The Networks counter that there is nothing wrong with aggregating the test markets from Hawkins' declaration because the twenty-percent rule refers to subscribers to a particular network station, not the

26

station whose market is being invaded.

We need not resolve the above disputes regarding the interpretation and application of the twenty-percent rule.[17]  Instead, we reverse the district court's finding of substantial likelihood of success in demonstrating willful or repeated violations because the court relied on extrapolations from only five test markets. As noted above, we can find no evidence in the record that the five markets tested by Hawkins are representative of EchoStar's five-million nationwide satellite subscribers in two-hundred and thirty different markets across the country.  We refuse to engage in speculation and conjecture in reviewing this nationwide preliminary injunction.  See Chapman, 861 F.3d at 1518.  The court's finding that the Networks' had a substantial likelihood of success in demonstrating willful and repeated violations is erroneous because it is based on extrapolations from 5 out of 230 markets in the United States, and there are no findings that these five test markets are representative of EchoStar's nationwide subscriber base.

**c.  Corrective Action**

The district court's third ground for finding willful and repeated violations for preliminary injunction purposes was the fact that EchoStar failed to demonstrate

[17] Further, because no party raises the issue, we need not decide the propriety of applying such a standard from Committee Reports which predate the current version of § 119(a)(5).

corrective action. Specifically, the court found that: (1) there was no evidence that EchoStar intended to take corrective action in light of Hawkins' findings of presumptively illegal subscribers, and (2) there was no evidence that EchoStar turned off its pre-July 1998 subscribers signed-up in reliance on PrimeTime's subjective qualification process, which was held insufficient to comply with SHVA in ABC, Inc. v. PrimeTime 24, 184 F.3d 348 (4th Cir. 1999), CBS II, 48 F. Supp. 2d 1342, and CBS I, 9 F. Supp. 2d 1333.

As to the first finding, the court reasoned that Hawkins' declaration established that at least 9,956 of EchoStar's subscribers in the five test markets were presumptively illegal. The court reasoned that "Hawkins does not suggest that a substantial portion of those 9,956 presumptively illegal subscribers received waivers or had field testing performed at their households, but instead states only that 'certain subscribers' received waivers or were subjected to field testing." Finding that Hawkins did not "suggest that EchoStar plans to take corrective action with regard to those subscribers," the court inferred that EchoStar was "aware that significant numbers of its subscribers presumptively do not reside in unserved households, [and] has not acknowledged that fact and apparently has taken no corrective action," which "demonstrates a willful disregard of [SHVA]."

EchoStar argues that the foregoing conclusion is clearly erroneous because

28

the Networks submitted no evidence that EchoStar did not intend to bring itself into compliance and the record actually establishes the opposite.   We agree that the district court erred.

The district court's inference that EchoStar will not take corrective action is an abuse of discretion on this record.  First, the court rejected Hawkins' suggestion that some of the 9,956 presumptively illegal subscribers were eligible under the Act because the individuals received favorable signal strength tests or waivers from the local affiliates.  Because EchoStar did not introduce evidence of waivers or signal tests in the preliminary injunction proceedings, the court inferred that no such proof of compliance existed and no such measures had been taken.  Such an inference is inconsistent with Hawkins' declaration that "certain subscribers are included in the sorting even though they have obtained [waivers] or cannot, in fact, receive a Grade B signal . . . as confirmed by actual field testing." (emphasis supplied).  As is evident, the court rejected Hawkins' assertion that certain subscribers "have obtained" signal tests or waivers, and concluded that EchoStar did not possess such evidence, without any record evidence indicating this statement was untrue or otherwise not credible.  Without the benefit of an evidentiary hearing, the district

court erred in rejecting Hawkins' assertions as not credible.[18]  We conclude that the drastic remedy of a nationwide injunction should be based on stronger evidence than we find in this record.

Also, the district court erred in finding willful and repeated violations from EchoStar's failure to come forward with evidence that its pre-July 1998, PrimeTime-derived subscribers, qualify as "unserved."  The district court reached this conclusion by erroneously relying on what it perceived to be a concession by Charles Ergen, EchoStar's president and Chief Executive Officer, that EchoStar did not attempt to determine the eligibility of its pre-July 1998 subscribers until September of 1999.

Ergen's affidavit discusses EchoStar's testing of pre-July 1998 subscribers under the new ILLR model, and indicates the results will be available soon. Ergen's affidavit also suggests that EchoStar did in fact test all of its subscribers to

---

[18] A district court need not hold an evidentiary hearing prior to the issuance of every preliminary injunction.  See All Care Nursing Service v. Bethesda Memorial, 887 F.2d 1535, 1538 (11th Cir. 1989).  "Where the injunction turns on the resolution of bitterly disputed facts, however, an evidentiary hearing is normally required to decide credibility issues."  Id.

Because the district court rejected the Networks' proffer of SHVA and Improvement Act noncompliance, the only record evidence on this bitterly contested issue was Hawkins' declarations.  The court, however, rejected portions of Hawkins' affidavit and adopted an inference advanced by the Networks which had no support in the record.  Had the court held an evidentiary hearing, it would have been free to discount Hawkins' statements as uncredible. However, on the face of Hawkins' affidavits and the Networks' arguments, the court was not at liberty to make such a credibility determination or inferential leap on this contested issue without the benefit of an evidentiary hearing.

ensure SHVA compliance.   The Networks argue that because Ergen's affidavit states only that EchoStar tests "potential subscribers," this demonstrates that EchoStar only screens new customers, and not its pre-July 1998 subscribers.

The Networks' interpretation of Ergen's affidavit, which the district court embraced, is plausible.  We, however, did not read Ergen's statements that way.  In the face of two plausible interpretations of evidence submitted to demonstrate a contested issue, the district court is not at liberty to accept one construction of the evidence and reject the other without the benefit of an evidentiary hearing.[19]  See McDonald's Corp. v. Robertson, 147 F.3d 1301, 1312 (11th Cir. 1998).  In the absence of an evidentiary hearing, we cannot conclude that what we know from the instant, sparse record about Echostar's handling of its pre-July 1998, subscribers adds much to the resolution of the substantial likelihood of success issue.

### 3. Conclusion

---

[19]The court not only engaged in improper speculation here, but ultimately avoided another critical question: Do the pre-July 1998 subscribers qualify as "unserved?" With the passage of the Improvement Act, there is a likelihood that many of EchoStar's pre-July 1998 subscribers were grandfathered into the Act's statutory copyright license.  See, e.g., 17 U.S.C. § 119(e) (extending the statutory copyright license until 2004 for subscribers who do not receive a Grade A signal and who "had satellite service of such network signal terminated after July 11, 1998, and before October 31, 1999, as required by this section, or received such service on October 31, 1999").  The district court failed to examine or recognize that many of EchoStar's pre-July 1998 subscribers might otherwise be eligible under the Act whether or not the subscriber qualified as "unserved" under § 119(d)(10)(A).  This contested issue may have considerable relevance to the substantial likelihood of success issue and should have been explored by the court before entering this sweeping nationwide preliminary injunction.

In light of the district court's rejection of the only evidence adduced by the Networks, and in light of our holding that the only other evidence – Hawkins' declaration pertaining to only to five markets – is insufficient by itself to support factual findings regarding EchoStar's nationwide market, we hold that the district court's application of the twenty-percent rule was flawed. We also hold that the evidence in the instant record with respect to Echostar's delay in achieving compliance and its actions with respect to correcting violations is less than dispositive. We cannot sustain the drastic remedy of a nationwide preliminary injunction on a record as sparse as this. Accordingly, we conclude that the district court abused its discretion in granting this nationwide preliminary injunction.[20] On remand, the Networks will have an opportunity to adduce evidence in an attempt to satisfy their initial burden, and if the Networks offer sufficient proof to warrant reasonable inferences on a nationwide scope so as to trigger the statutory presumption that Echostar is servicing "served households" across the country, then Echostar will have an opportunity to rebut the presumption in one or more of the ways provided for in the statute and regulations.

**D. First Amendment**

---

[20] Because of this conclusion, we need not address the parties' remaining arguments as to the other the prerequisites for the issuance of a preliminary injunction, but remand for the reconsideration of each of the other three elements as well.

Next, EchoStar attacks the constitutionality of SHVA and the Improvement Act under the First Amendment.[21] It contends that distant network programming is speech, and that SHVA and the Improvement Act restrict such speech by prohibiting programming that subscribers are legally entitled to receive. EchoStar argues that SHVA and the Improvement Act are premised on a content-based governmental judgment that viewers should watch local programming rather than distant network programming and such content-based restrictions violate the First Amendment. We find EchoStar's First Amendment challenge to be wholly without merit.

The copyright laws, which are explicitly sanctioned by the Constitution, see U.S. Const. Art. I, § 8, provide adequate First Amendment protection by protecting only expression, not facts and ideas. See Harper & Row v. Nation Enterprises, 471 U.S. 539, 556, 105 S. Ct. 2218, 2228 (1985). Indeed, copyright laws are "engine[s] of free expression" that "establish[ ] a marketable right to the use of one's expression" and thereby "suppl[y] the economic incentive to create and disseminate ideas." Id. at 558, 105 S. Ct. at 229. In Harper & Row v. Nation Enterprises, the Supreme Court rejected the suggestion that the First Amendment requires broader

_____

[21] EchoStar also argues that the vagueness and overbreadth of the preliminary injunction violates the First Amendment. Because we vacate the preliminary injunction, we need not address these arguments at this time.

33

exceptions to the copyright laws than those explicitly conferred by Congress. See id. at 560, 105 S. Ct. at 2230 ("In view of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, . . . we see no warrant for expanding the doctrine of fair use . . ." on First Amendment grounds.). We follow such reasoning in rejecting the instant challenge.

Nothing in SHVA or the Improvement Act restricts the content of EchoStar's programming. Instead, SHVA, as amended by the Improvement Act, creates a narrow exception to the generally applicable, and constitutional, Copyright Act. Thus, contrary to EchoStar's contention, the Act does not threaten its free speech rights but actually permits more speech than EchoStar would constitutionally be entitled to under the Copyright Act. The First Amendment does not require any broader exceptions to the Copyright Act than Congress has conferred through SHVA and the Improvement Act's narrow copyright licenses. See id. at 560, 105 S. Ct. at 2230.

EchoStar argues that SHVA's "unserved household" restriction is a special rule for satellite carriers which is premised on an impermissible content-based governmental judgment that viewers should watch local programming rather than distant. It contends SHVA is conditioned in an unconstitutional manner by its

34

preference for localism.

Even if EchoStar's provision of distant network programming is "speech" under the First Amendment,[22] which we need not and do not decide at this time, SHVA and the Improvement Act's restrictions on that speech are content neutral and serve important governmental interests unrelated to the suppression of speech. In Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 643, 114 S. Ct. 2445, 2459 (1994), the Supreme Court explained that "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." (citing Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804, 104 S. Ct. 2118, 2128 (1984); Heffron v. International Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 649, 101 S. Ct. 2559, 2564 (1981)). Applying this standard in Turner, the Court rejected cable

---

[22] We assume arguendo that the provision of distant network services constitute speech under the First Amendment. In Turner Broadcasting System, Inc. v. FCC, 515 U.S. 622, 636, 114 S. Ct. 2445, 2456 (1994), the Supreme Court explained that "[t]hrough 'original programming or by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.'" See also Hurley v. Irish-American Gay, Lesbian & Bisexual Group, 515 U.S. 557, 568-69, 115 S. Ct. 2338, 2346 (1995) (explaining that "[c]able operators, for example, are engaged in protected speech activities even when they only select programming originally produced by others"). While EchoStar does not select the programming aired on the Networks' channels, it does "exercis[e] editorial discretion over which stations or programs to include in its repertoire," insofar as it chooses which Network channels to provide through distant network programming. Because we reject EchoStar's First Amendment challenge on other grounds, we need not decide whether the provision of distant network programming is speech, but assume arguendo that such is the case.

35

operators First Amendment challenge to the Cable Television Consumer Protection and Competition Act of 1992, which made it compulsory to include local commercial and public broadcasting stations in the cable operator's line-up. Turner reasons that while the must carry rules impose numerous burdens on cable operators, none of the burdens are related to speech. Id. at 644-46, 114 S. Ct. at 2460-62. Instead, the Court found that "Congress designed the must carry provisions not to promote speech of a particular content, but to . . . ensure that all Americans, especially those unable to subscribe to cable, have access to free television programming – whatever its content." Id. at 649, 114 S. Ct. at 2462.

The instant case is a fortiori from Turner. Localism in SHVA and the Improvement Act is not preferred for anything related to the content of the local broadcasts. Instead, Congress limited the benefit of the compulsory copyright license to achieve the limited goal of providing access to network programming for households that cannot otherwise receive such programming, see 17 U.S.C. § 119(d)(10)(A), while creating the least possible interference with Networks' copyrights. Balancing the two, SHVA, as amended by the Improvement Act, merely gives households, who could not otherwise receive local network programming through an over-the-air broadcast, the option of receiving network programming from a satellite carrier. Because the beneficiaries of this right include

36

only households that cannot otherwise receive local network programming, the Networks' copyrights are not threatened. In this sense, the Act strikes a balance between protecting the copyright interests of the Networks and the public interest in obtaining network programming, whatever its content, for all Americans.

EchoStar's argument – that the statute is content based because the effect of its operation prefers local network programming – is flawed for the same reason a similar argument failed in Turner. Indeed, the Congressional purpose in the instant case is even more unrelated to content than in Turner. Here, Congress sought merely to facilitate access to Network programming for those households that cannot otherwise receive the same – i.e., for "unserved households." "Unserved households" are, inter alia, those unable to receive adequate signal strength. See 17 U.S.C. § 119(d)(10)(A). The fact that the source of the best candidate for a satisfactory signal strength is local is a function of geography and physics, not a Congressional purpose to prefer local speech. In other words, the mere fact that the signal strength is measured from sources which are "local" with respect to any particular household is a necessary, but entirely incidental, function of measuring eligibility. Accordingly, the narrow, compulsory license of SHVA, as it is amended by the Improvement Act, is not content-based, but is merely a Congressional preference that all Americans have access to network programming, wherever they

live.

A content-neutral restriction "that impose[s] incidental burdens on speech," will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Turner, 512 U.S. at 662, 114 S. Ct. at 2469 (quoting United States v. O'Brien, 391 U.S. 367, 377, 88 S. Ct. 1673, 1679 (1968)).

SHVA's purpose of providing a limited license to retransmit network programming to unserved private residences, see H.R. Rep. No. 100-887 (II), at 19-20 (1988), reprinted in 1988 U.S.C.C.A.N. 5648-49,[23] is supported by the substantial government interest of ensuring that Americans who cannot otherwise receive network programming have access to it, whatever its content. Such an interest is unrelated to the suppression of speech, and indeed serves a governmental

_____

[23] The House Report supporting SHVA explains that the statutory license is provided "for the sole purpose of facilitating the transmission of each network's programming to . . . areas which are unserved by that network." See H.R. Rep. No. 100-887 (II), at 19-20 (1988), reprinted in 1988 U.S.C.C.A.N. 5648-49. The "Committee believe[d] that this approach w[ould] satisfy the public interest in making available network programming in these (typically rural) areas, while also respecting the public interest in protecting the network-affiliate distribution system." Id. at 20. Thus, in extending SHVA's statutory license, the "Committee intend[ed] . . . to satisfy both aspects of the public interest – bringing network programming to unserved areas while preserving the exclusivity that is an integral part of today's network affiliate relationship." Id.

purpose of the "highest order" by promoting the dissemination of speech. See

Turner, 512 U.S. at 663, 114 S. Ct. at 2470 ("assuring that the public has access to a

multiplicity of information sources is a governmental purpose of the highest order,

for it promotes values central to the First Amendment"). Whatever limits Congress

placed on SHVA's license is motivated by and consistent with the dual goals of the

copyright laws to promote the dissemination of creative expression, and provide

incentives for copyright owners to produce such original works. Both purposes are

well within constitutional bounds, as Congress has the authority to define the

contours of copyright law, see U.S. Const. art. I, § 8 cl. 8, and the monopoly

privilege created by the Copyright Act is designed to secure the benefits of an

author's creation for the public, see Sony v. Universal City Studios, 464 U.S. 417,

429, 104 S. Ct. 774, 782 (1984). Such precise tailoring certainly survives scrutiny,

intermediate or otherwise.[24]

To the extent that SHVA or the Improvement Act provide a special rule for

satellite carriers, this rule is more permissive, and is indeed an exception to the

general restrictions in § 106 of the Copyright Act, see 17 U.S.C. § 106 (conferring

exclusive rights to use in copyright owner). Merely because EchoStar would like

---

[24] We need not decide whether SHVA or the Improvement Act impose even incidental burdens on speech. Instead, we assume arguendo that it does because the challenged statutes even survive the more heightened inquiry attending intermediate scrutiny.

this license to be broader than Congress envisioned it does not mean that it infringes on the First Amendment. There is "no first amendment right to . . . make commercial use of the copyrighted works of others." United Video, Inc. v. FCC, 890 F.2d 1173, 1190-91 (D.C. Cir. 1989) (rejecting cable operators challenge to the compulsory license granted it by 17 U.S.C. § 111 based on the notion that the statute's failure to include authorization for rebroadcasting syndicated programming violates the First Amendment). Accordingly, we reject EchoStar's First Amendment challenge as meritless.

## E. Transferability of Grandfathered Rights under § 119(e)

Lastly, EchoStar asks us to revisit the district court's judicial interpretation of 17 U.S.C. § 119(e) (West Supp. 2001). Subsection (e) is one of the Improvement Act's grandfathering provisions, which provides:

> **(e) Moratorium on copyright liability.**– Until December 31, 2004, a subscriber who does not receive a signal of Grade A intensity (as defined in the regulations of the F[CC] . . . under section 73.683(a) of title 47 of the C[FR] . . . , as in effect on January 1, 1999, or predicted by the F[CC] . . . using the I[LLR] . . . methodology described by the F[CC] . . . in Docket No. 98-201) of a local network television broadcast station shall remain eligible to receive signals of network stations affiliated with the same network, if that subscriber had satellite service of such network signal terminated after July 11, 1998, and before October 31, 1999, as required by this section, or received such service on October 31, 1999.

17 U.S.C. § 119(e) (West Supp. 2001). The dispute here is whether subscribers

40

may transfer to a different satellite carrier and retain their rights to receive distant network signals under § 119(e).

Addressing this question, the district court reasoned that § 119(e) is "silent, and therefore ambiguous, as to whether a subscriber 'shall remain eligible to receive signals of network stations' only from his or her previous satellite service provider, or from any satellite service provider." Finding the statute ambiguous, the court turned to the legislative history, and specifically focused on the Conference Committee Report accompanying the Improvement Act, which states that "grandfathered status is not transferable to a different carrier . . .," see Conf. Rep., 146 Cong. Rec. H11794 (daily ed. Nov. 9, 1999).[25] Based on this Report, the court held that "grandfathered status is not transferable to a different carrier."

EchoStar argues that the district court erred in looking to legislative history because the plain language of the statute is clear. It contends that the district court rewrote the statute when it read into it a transfer limitation because no such restriction is found in § 119(e)'s plain language.

---

[25] The Conference Committee Report for the Improvement Act explains that:

> [t]he words "shall remain eligible" in section 119(e) refer to eligibility to receive stations affiliated with the same network from the same satellite carrier through use of the same transmission technology at the same location; in other words, grandfathered status is not transferable to a different carrier . . .

Conf. Rep., 146 Cong. Rec. H11794 (daily ed. Nov. 9, 1999).

41

This Circuit's "decisions . . . mandat[e] that ambiguity in statutory language be shown <u>before</u> a court delves into legislative history." <u>PrimeTime 24</u>, 245 F.3d at 1224 (citing <u>United States v. Veal</u>, 153 F.3d 1233, 1245 (11th Cir. 1998) ("Review of legislative history is unnecessary unless a statute is inescapably ambiguous.") (citation and quotation omitted)). Thus, in this Circuit, "'[w]e begin our construction of [a statute] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision.'" <u>Id.</u> at 1222 (quoting <u>Harris v. Garner</u>, 216 F.3d 970, 972 (11th Cir. 2000) (en banc)).

Accordingly, our first task in construing § 119(e) is to determine its plain meaning and whether its terms are ambiguous. <u>See id.</u> The meaning of § 119(e) is clear: It grandfathers all subscribers who do not receive at least a Grade A signal, as defined by the FCC, if that subscriber's satellite service of such network was terminated between July 11, 1998, and October, 31, 1999, as required by § 119, or if the subscriber received such service on October 31, 1999.

For the reasons discussed below, we conclude that § 119(e) is unambiguous and does not include a condition of nontransferability. First, its plain and clear language confers eligibility upon subscribers:

> a subscriber . . . shall remain eligible to receive signals of network
> stations affiliated with the same network, if that subscriber has satellite

42

> service of such network signal terminated after July 11, 1998, and before October 31, 1999, as required by this section, or received such service on October 31, 1999.

17 U.S.C. § 119(e). Eligibility belongs to the subscriber, and nothing is said in the statute about carriers. In particular, the subscribers' eligibility is not conditioned on remaining with the same carrier.

Second, the statute expressly limits the rights conferred to the "same network," stating that the subscriber "shall remain eligible to receive signals of network stations affiliated with the same network, if that subscriber has satellite service of such network signal terminated after July 11, 1998, and before October 31, 1999, as required by this section, or received such service on October 31, 1999." Persuasively, then, the statute contains a "same network" requirement but does not contain a "same carrier" restriction.

Finally, the statutory provision is crafted with great precision. It applies only to subscribers who do not receive a signal of grade A intensity, and only to subscribers falling within certain very specific date restrictions. With such precision, we cannot assume that Congress stated one condition, i.e., the same network, but inadvertently omitted to state another condition which would prohibit a subscriber's change of carrier. The fact that the statutory provision confers a benefit upon the subscriber, and not the carrier, makes us doubt that that Congress

43

intended to benefit then extant carriers by locking subscribers in to their carrier as of October 31, 1999.[26]  In any event, we need not speculate into such motives, as "[w]e are not at liberty to imply a condition which is opposed to the explicit terms of the statute . . . To [so] hold . . . is not to construe the Act but to amend it." Fodorenko v. United States, 449 U.S. 490, 513, 101 S. Ct. 737, 750 (1981) (quoting Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 38, 55 S. Ct. 31, 36 (1934)). "It is not the function of the courts to amend statutes under the guise of 'statutory construction.'" Id. at 514 n.35, 101 S. Ct. at 751 n.35; United States v. Cooper Corp., 312 U.S. 600, 605, 61 S. Ct. 742, 744 (1941) ("It is not our function to engraft on a statute additions which we think the legislature logically might or should have made.").  Because § 119(e) is unambiguous and fails to contain a transferability restriction, we refuse to read a "same carrier" limitation into the statute.

Furthermore, we will not consult the Conference Committee Report, as resort to legislative history is unnecessary, and indeed, improper, where the statute's terms

---

[26]  The Networks' interpretation also seems inconsistent with the fact that the provision grandfathers certain subscribers whose service was terminated before October 31, 1999.  The Networks' interpretation would seem to imply that such terminated subscribers could "remain eligible" only by resubscribing with the particular carrier which terminated them.  While that concept is not entirely unthinkable, it certainly is not stated in the statute, and it points up the magnitude of the additions to the statute which the Networks urge us to engraft onto the provision.

are plain and unambiguous. See, e.g., Circuit City Stores, Inc. v. Adams, – U.S. –, 121 S. Ct. 1302, 1311 (2001) (refusing to examine legislative history where the face of the statutory provision was unambiguous); Ratzlaf v. United States, 510 U.S. 135, 147, 114 S. Ct. 655, 662 (1994) (Even where "[t]here are . . . contrary indications in the statute's legislative history . . . we do not resort to legislative history to cloud a statutory text that is clear."); PrimeTime 24, 245 F.3d at 1224 n.2 ; Harris, 216 F.3d at 976 ("When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of statutory language."); Veal, 153 F.3d at 1245 ("Review of legislative history is unnecessary unless a statute is inescapably ambiguous"). We must adhere to this principle because "it is ultimately the provisions of our laws rather than the principal concern of our legislators by which we are governed." Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1338 (11th Cir. 1999) (en banc) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S. Ct. 998, 1002 (1998)). Section 119(e)'s plain and unambiguous terms do not contain a transferability limitation, and we reverse the district court's attempt to engraft such a restriction onto the statute.

## III. CONCLUSION

For the foregoing reasons, we hold that the district court abused its discretion

in granting the nationwide preliminary injunction. Accordingly, we vacate the preliminary injunction, and remand for further proceedings not inconsistent with this opinion. In arriving at our decision, with respect to the transferability issue, we reverse the district court's interpretation of § 119(e), and we affirm the district court's rejection of Echostar's First Amendment challenge.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED.**